# EXHIBIT A

SESSIONS ISRAEL & SHARTLE
ATTORNEYS AT LAW

RACHEL M. FLEISHMAN
Attorney Licensed in the State of Florida
Direct: (813) 775-2170
rfleishman@sessions.legal

April 3, 2026

**Via Email: talal@pzlg.legal; brad@pzlg.legal**
Patti Zabaleta Law Group
110 SE 6th St., Fl 17
Fort Lauderdale, FL 33301

**Re: *McIntosh, Jermaine v. Experian Information Solutions, Inc. et.al.***
**Southern District of Florida, Case No. 0:26-cv-60370-DMM**
**Subpoena issued to NCB Management Services, Inc.**

Dear Counsel:

SESSIONS, ISRAEL & SHARTLE represents NCB Management Services, Inc. (NCB) related to the subpoena issued in the referenced matter requesting sale documents related to an account in the name of Jermaine McIntosh.

On March 21, 2023, Exeter Finance LLC sold an account in Jermaine McIntosh's name to NCB Management Services, Inc. Enclosed is the Purchase and Sale Agreement, Bates Nos. NCB 0001-0037; the Bill of Sale and Assignment of Accounts, Bates Nos. NCB 0038; and Account Schedule, Bates Nos. 0039-0060, in response to the subpoena.

We consider this matter resolved and will close our file. Please contact me if you need to discuss further.

Sincerely,

Rachel Fleishman

Rachel Fleishman, Esq.

RMF
Enclosure

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT LAUDERDALE DIVISION**

**Case No. 0:26-cv-60370-DMM**

**JERMAINE MCINTOSH**

Plaintiff,

v.

**EXPERIAN INFORMATION SOLUTIONS, INC., ET AL,**

Defendant.

______________________________________/

**DECLARATION OF CUSTODIAN OF RECORDS**

1. My name is Jonathan Thompson. I am competent to testify and have personal knowledge of the facts stated herein.

**2.** I am employed by and am the custodian of records for **NCB MANAGEMENT SERVICES, INC.** Attached hereto are 60 pages of records of **NCB MANAGEMENT SERVICES, INC.**

**3.** The attached records were made at or near the time of the occurrence of the matters set forth in the attached records by, or from information transmitted by, a person with knowledge of those matters. The attached records were kept by **NCB MANAGEMENT SERVICES, INC.** in the regular course of its business, and as a regular practice of **NCB MANAGEMENT SERVICES, INC.** The attached records were made in the course of the regularly conducted business activities of **NCB MANAGEMENT SERVICES, INC.** and as a regular practice of **NCB MANAGEMENT SERVICES, INC.**

4. The records attached hereto are exact duplicates of the originals.

5. I declare under penalty of perjury that the foregoing is true and correct.

Signed by:
Jonathan Thompson
EBC903B229604A0...

Signature

Dated: April 6, 2026

***Execution Version***

# PURCHASE AND SALE AGREEMENT
# FORWARD FLOW

BETWEEN

EXETER FINANCE LLC

- - AND - -

NCB MANAGEMENT SERVICES, INC.

Dated and Effective as of

January 1, 2022

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made effective as of January 1, 2022 (the "**Effective Date**") between Exeter Finance LLC, a Delaware limited liability company ("**Seller**"), and NCB Management Services, Inc. ("**Buyer**").

## WITNESSETH:

WHEREAS, Seller owns and desires to sell, and Buyer desires to purchase, certain Accounts (as defined herein) on a forward flow basis for a two (2) year period; and

WHEREAS, Seller anticipates each sale shall have a total aggregate face value between $25 million to $200 million;

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

"**Account Criteria**" means the criteria set forth in the Account Criteria Schedule, as the same may be amended from time to time in accordance with Section 2.1.

"**Account Criteria Schedule**" means the schedule attached hereto as Exhibit H.

**"Account Document(s)"** means any application, agreement, billing statement, promissory note, retail installment contract, notice of default, notice of cure, notice of intent to sell letter, deficiency letter, proof of mailing, transaction history, and other evidence of indebtedness reasonably necessary to establish the validity and enforceability of an Account. Account Documents shall be in electronic form.

**"Accounts"** means certain of Seller's accounts sold to Buyer on a Closing Date pursuant to this Agreement. Each individual sale shall be documented by an Account Schedule and a Bill of Sale and Assignment using the forms attached hereto as Exhibit A and Exhibit B to this Agreement.

**"Account Schedule"** means with respect to each Closing Date the schedule, attached as Exhibit A hereto, setting forth a summary of the Accounts purchased on such Closing Date, including: the aggregate number of Accounts, aggregate Current Balance, Purchase Price Percentage, and aggregate Purchase Price.

**"Agreement"** means this Purchase and Sale Agreement, including the cover page and all Exhibits and Schedules hereto, as it may be amended, supplemented or modified from time to time.

**"Allocated Account Price"** means the individual price of any Account sold hereby which is calculated as the product of the Purchase Price Percentage and the Current Balance for such Account sold hereby.

**"Balance Adjustments"** means, with respect to any Account, any amount that is added to the account balance after charge off to effect the reversal of a provisional credit granted prior to charge off and that does not fit into the category of interest or fees/charges.

**"Bill of Sale and Assignment"** means the document to be delivered to Buyer on or before each Closing Date, in the form attached hereto as Exhibit B.

**"Business Day"** means any day on which Seller is open for business other than a Saturday, a Sunday, or a federal holiday.

**"Claim"** means any claim, action, suit or other actual or threatened proceeding, loss, judgment, damage, liability, cost, and expense.

**"Closing Date"** means the date and time of each sale of Accounts as set by Seller, notified to Buyer by delivery of a Computer file pursuant to Section 2.3 of this Agreement, and also specified in the related Account Schedule; provided, that in the event Buyer notifies or is deemed to notify Seller that it does not agree to purchase the applicable Accounts on such date in accordance with Section 2.1(b), such date shall not be deemed a "Closing Date" hereunder. Buyer and Seller agree that each Closing Date shall be a Business Day and that Seller shall set a Closing Date in each of March 2022, September 2022, March 2023 and September 2023 unless otherwise specified by written agreement between Seller and Buyer, it being understood and agreed that Seller shall be deemed to have satisfied such requirement if it sets a Closing Date in each such month notwithstanding any failure of a Closing Date to occur as a result of Buyer's election not to purchase the Accounts in accordance with Section 2.1(b); provided, that, Seller may specify up to two additional Business Days for sales of accounts per calendar year and, if any such date is agreed by Buyer, such date also shall be a Closing Date.

**"Computer File"** means that certain computer file or files, to be provided by Seller to Buyer, setting forth all relevant information on the Accounts and the Obligor(s), including but not limited to Current Balance; Issuer; any Prior Owner(s); auto dealership; state of origination; original Account number(s) and, if different, Account number(s) on the charge-off date and current Account number(s); the name, address, phone number(s), date of birth, and social security number of each Obligor; open date; original balance; date of last Obligor Payment; amount of last payment; date of first delinquency; charge-off date; charge-off balance; Principal balance; total amount of interest added after charge-off (if any); total amount of fees/charges added after charge-off (if any); total Balance Adjustments added after charge-off; total amount of payments/credits applied to the

Account after charge-off (if any); repossession date; interest rate; and account collateral description.

**"Current Balance"** means the principal balance owing by the Obligor after sale of the collateral originally securing the Account, as reflected on the Computer File and the corresponding deficiency letter, minus any Obligor payments received after the date of the sale of collateral. Current Balance may also include Accounts where the vehicle has not yet been sold.

**"Cutoff Date"** means with respect to each Closing Date the cutoff date determined by Seller and set forth in the related Account Schedule.

**"Deficiency Account"** means each Account designated as a Deficiency Account by Seller on the Computer File.

**"Insurance Loss Account"** means each Account designated as an Insurance Loss Account by Seller on the Computer File.

**"Issuer"** or **"Prior Owner"** means the entity or entities from which an Account originated or the entity or entities that owned an Account prior to Seller, respectively.

**"Obligor"** means the current and unreleased obligor(s) with respect to an Account, including, without limitation, any and all guarantors, sureties, or other persons or entities liable on the Account.

**"Obligor Payments"** means any payments or other consideration distributed or paid by or on behalf of an Obligor.

**"Purchase Price"** means with respect to each Closing Date the amount, in dollars, to purchase the applicable Accounts, calculated by multiplying the aggregate Current Balance by the Purchase Price Percentage as shown on the Account Schedule for such Closing Date.

**"Purchase Price Percentage"** has the meaning for each Closing Date specified in the Account Schedule for such Closing Date, which shall be [redacted] unless otherwise specified by written agreement between Seller and Buyer.

**"Termination Date"** means the earlier of December 31, 2023, or the date of termination pursuant to Article XII below.

**"Transfer Documents"** means all documents that are required to be delivered on each Closing Date by Seller or Buyer pursuant to Section 3.1.

## ARTICLE II
## PURCHASE AND SALE OF THE ACCOUNTS

Section 2.1. Agreement to Sell and Purchase Accounts. (a) On each Closing Date, Seller agrees to sell, and Buyer agrees to purchase, all of Seller's right, title, and interest in and to the Accounts described in the applicable Account Schedule, subject to the terms, provisions, conditions, limitations, waivers, and disclaimers set forth in this Agreement. Buyer and Seller hereby agree that the Accounts set forth in any Account Schedule shall have an aggregate principal amount of not less than [redacted] and not greater than [redacted] and shall conform in all material respects to the Account Criteria.

(b) Notwithstanding the foregoing, Seller may, upon not less than fourteen (14) calendar days written notice to Buyer (any such notice, a "**Criteria Amendment Notice**"), make amendments to the Account Criteria in its sole discretion. Within three (3) Business Days of its receipt of a Criteria Amendment Notice, Buyer shall notify Seller of its acceptance or rejection of the amendments contained therein. The failure of the Buyer to so notify the Seller within three (3) Business Days shall be deemed an acceptance by Buyer. Following the date of any rejection of any amendment to the Account Criteria by Buyer, unless and until the Account Criteria conform in all material respects to the initial Account Criteria set forth in Exhibit H hereto or Buyer shall have agreed to subsequently amended Account Criteria, Buyer shall have the right but not the obligation to purchase the Accounts on any Closing Date, and shall notify Seller at least one (1) Business Day prior to each Closing Date proposed by Seller whether it agrees to purchase the Accounts on such proposed Closing Date. The failure to so notify the Seller shall be deemed notice by Buyer of its intent not to purchase the Accounts on such Closing Date. Seller hereby acknowledges and agrees that in the event Buyer notifies or is deemed to notify Seller of its intent not to purchase the Accounts on any proposed Closing Date in accordance with this Section 2.1(b), Seller shall have the right to sell such Accounts to a third party.

Section 2.2. Agreement to Assign/Buyer's Right to Act. On each Closing Date, Seller shall deliver to Buyer an Account Schedule, in the form of Exhibit A hereto, a Bill of Sale and Assignment, in the form of Exhibit B hereto, and a Limited Power of Attorney, in the form of Exhibit F hereto, in each case executed by an authorized representative of Seller. The Bill of Sale and Assignment shall sell, transfer, assign, set-over, quitclaim, and convey to Buyer all right, title, and interest of Seller in and to each of the Accounts described in the related Account Schedule and related Account Documents and the proceeds of such Accounts received by Seller on or after the Cutoff Date.

Section 2.3. Account Schedule and Computer File. On each Closing Date, Seller shall provide an Account Schedule in the form of Exhibit A hereto outlining information about the Accounts set forth therein and the terms of purchase. Seller shall give notice to Buyer of each Closing Date by delivering to Buyer, at least three (3) Business Days prior to each Closing Date, the Computer File with information as of the related Cutoff Date, in a format acceptable to Buyer.

Section 2.4. Purchase Price/Payment. On or before 2:00 p.m. EST on each Closing Date, Buyer shall pay to Seller the Purchase Price set forth in the Account Schedule for that Closing Date. All of such funds must be in immediately available funds in United States Dollars and remitted by wire transfer according to the instructions of Seller as set forth on Exhibit D hereto, made payable to Seller. Notwithstanding anything contained herein to the contrary, Buyer and Seller hereby agree that the Purchase Price set forth in any Account Schedule shall be no less than [redacted] and no greater than [redacted]

Section 2.5 Payments Received/Adjustments to Purchase Price. To the extent that Seller has received Obligor Payments prior to the applicable Cutoff Date, Seller shall reduce the balance of such Account for purposes of calculating the Purchase Price. Buyer shall be entitled to a credit of the Purchase Price Percentage multiplied by the payment amount against the Purchase Price to the extent such Account Balance did not reflect a reduction for such payment. If Seller has received any Obligor Payments on or after the applicable Cutoff Date and before the applicable Closing Date, Seller shall, at Buyer's option, remit such amount to Buyer within thirty (30) days of the Closing Date or deduct such amount from the Purchase Price. If Seller shall receive any Obligor Payments on or after the applicable Closing Date, Seller shall pay over and/or deliver such payments or other consideration to Buyer. Seller shall deliver such Obligor Payments on or within ten (10) business days after the end of the month in which payments were received and, if deemed necessary or appropriate by Seller, with an endorsement in the form substantially as follows: "Pay to the order of NCB Management Services, Inc." Seller shall indicate on the records related to any of the Accounts the date of receipt and amount of any payments. If Seller has deposited any Obligor Payments and issues a check or payment therefor to Buyer, Buyer shall retain the risk that any such payment so deposited by Seller shall be returned due to insufficient funds. Seller shall have a period of forty-five (45) days after the date Seller delivers to Buyer such payment to notify Buyer in writing that any such Obligor Payments were returned due to insufficient funds and specifying the amount thereof, whereupon Buyer shall not later than thirty (30) days following receipt of such notice, pay to Seller the amount of such payment.

Section 2.6. BUYER ACKNOWLEDGES THAT THE ACCOUNTS AND THE RELATED ACCOUNT ASSETS ARE BEING SOLD BY THE SELLER IN AN "AS IS" CONDITION AND "WITH ALL FAULTS" AND WITHOUT RECOURSE, UNLESS OTHERWISE NOTED. EXCEPT AS EXPRESSLY STATED WITHIN THIS AGREEMENT, THE SALE AND TRANSFER OF ACCOUNTS AND RELATED ACCOUNT ASSETS TO BUYER PURSUANT TO THIS AGREEMENT IS EXPRESSLY MADE WITHOUT RECOURSE, AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR CHARACTER, INCLUDING, BUT NOT LIMITED TO, WARRANTIES BY SELLER PERTAINING TO THE COLLECTABILITY OF THE ACCOUNTS OR THE SUFFICIENCY OF THE INFORMATION FURNISHED TO BUYER CONCERNING THE ACCOUNTS AND NO RESPONSIBILITY HAS BEEN OR IS ASSUMED BY SELLER OR BY ANY MANAGER, DIRECTOR, OFFICER, PERSON, AGENT, OR REPRESENTATIVE ACTING OR PURPORTING TO ACT ON BEHALF OF SELLER AS TO THE CONDITION OF THE ACCOUNTS OR THE RELATED ACCOUNT ASSETS, EXCEPT AS OTHERWISE PROVIDED HEREIN. THE TERMS

AND PROVISIONS OF THIS SECTION 2.6 SHALL SURVIVE THE CLOSING OR ANY TERMINATION OF THIS AGREEMENT.

## ARTICLE III
## TRANSFER OF ACCOUNTS AND DOCUMENTS

Section 3.1. Assignment of Accounts and Documents. On each Closing Date, Seller shall execute and deliver to Buyer the Bill of Sale and Assignment, Limited Power of Attorney, and such other documents as Buyer deems reasonably necessary, proper, or appropriate for the legal transfer of its right, title, and interest in and to the Accounts purchased on such Closing Date pursuant to this Agreement (collectively, the "**Transfer Documents**"). The Bill of Sale and Assignment shall have the same effect as an individual and separate bill of sale and assignment of each and every Account referenced therein. In the event that Buyer requests, at any time after the Closing Date, individual bills of sale or individual powers of attorney on any specific Accounts, Seller shall provide such to Buyer within fifteen (15) Business Days of such request, in a form reasonably acceptable to Buyer. Seller shall use commercially reasonable efforts to assist Buyer to document the chain of title of each of the Accounts, including obtaining documentation from any Issuer or Prior Owner.

Section 3.2 Account Documents; Appearances; Assignments of Judgment; Copies and Expenses.

(a) Account Documents. Seller will provide Buyer all Account Documents for all Accounts in its possession, custody, or control within forty-five (45) days after the applicable Closing Date, in an electronic format and order reasonably acceptable to Buyer, accompanied by an electronic file sufficient to link each Account Document to its corresponding Account. There shall be no charge for electronic copies of Account Documents. Further, Seller shall provide, within ten (10) Business Days after written notice from Buyer and at no cost to Buyer, a notarized Affidavit of Debt (in a form substantially similar to Exhibit C) in the event that Buyer requests such to assist the collection or litigation against any Account(s). Seller shall further provide any affidavits required by law for the maintenance and successful prosecution of litigation against any Obligor. Without limiting the foregoing, (i) Seller shall provide upon request executed affidavits and declarations in the forms set forth on Exhibits C-1 to C-4; and (ii) Seller shall provide individual assignments and lien releases on Seller's letterhead on the same terms and conditions as applicable to Affidavits of Debt as described above. Seller shall use reasonable efforts to provide Buyer with copies of additional documentation or information as necessary or desirable for Buyer to collect the accounts or for legal regulatory or compliance purposes.

(b) Appearances. If Buyer requests an appearance from Seller related to any litigation against any Obligor as a witness, deponent, or otherwise, Buyer will pay Seller reasonable travel and lodging expenses as well as an hourly rate equal to the hourly

wage or salary of the Seller employee for the time expended in making such an appearance. Buyer shall have no obligation to pay Seller for testimony or information that is required by a court of law or a regulatory body.

(c) Copies and Expenses. Seller reserves the right to retain copies of all or any of the Account Documents it provides to Buyer under Sections 3.1 or 3.2. All expenses of production and transportation of the Transfer Documents, Account Documents, and the other documents, instruments, and files to be delivered to Buyer pursuant to this Article III shall be borne by Seller.

## ARTICLE IV
## SERVICING/COLLECTION

Section 4.1. Servicing After Closing Date. The Accounts shall be sold and conveyed to Buyer on a servicing-released basis. As of the applicable Closing Date, all rights, obligations, and responsibilities with respect to the servicing of the Accounts, except as elsewhere provided in this Agreement, shall pass to Buyer, and Seller shall take no further action against the Accounts, except as provided in this Agreement. Seller shall be responsible to Buyer for any costs due to any recall and transfer of servicing. Seller shall, within thirty (30) Business Days of the applicable Closing Date, report to any credit reporting agency to which an Account has been reported that such Account has been sold and assigned to Buyer. At the request of Buyer, Seller shall send written notification to all Obligors of the sale of the Accounts from Seller to Buyer and direct that Obligor Payments be sent to Buyer. In the event that any Account Obligors continue to contact Seller after the applicable Closing Date, Seller shall notify the Obligors that the Accounts have been sold to Buyer and shall provide the contact name, address, and phone number provided by Buyer. Seller shall forward to Buyer, within ten (10) Business Days of receipt, any and all correspondence, notices and other documents received on any Account.

Section 4.2. Compliance with Laws. Buyer shall at all times comply with any and all applicable federal and state laws, rules regulations relating to its ownership of the Accounts. If Buyer collects or attempts to collect on an Account, Buyer shall at all times comply with all applicable federal and state laws, rules, and regulations applicable to such collection, including without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Telephone Consumer Protection Act, the Servicemembers Civil Relief Act, and analogous state laws (collectively, the "**Applicable Laws**"). Furthermore, Buyer shall not engage in any unfair, deceptive, or abusive acts or practices as defined by or interpreted by state or federal law. Buyer shall also monitor its service providers and require that all service providers comply with all Applicable Laws.

Section 4.3. Use of Seller's Name. Buyer may use the name of Seller, Issuer, or Prior Owner for purposes of identifying the chain of title to the Accounts in its collection, litigation, or financing efforts (or otherwise contemplated by this Agreement) with respect to the Obligors and Accounts. However, Buyer will not state or represent in any way Buyer

is performing such actions for or on behalf of Seller, or that Seller will take any action with regard to the Account or the Obligor, or that Buyer is Seller's agent, partner, or joint venturer with respect to the Accounts.

## ARTICLE V
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents warrants and covenants that as of the date of this Agreement and as of each Closing Date:

Section 5.1. Independent Evaluation. Buyer is a sophisticated investor and has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of the transaction contemplated by this Agreement. Buyer further represents that its decision to purchase the Accounts pursuant to this Agreement is and was based upon Buyer's independent evaluation as it has deemed warranted into the nature, collectability, and value of the Accounts and all other facts it deems material to its purchase and is entering into the transactions contemplated hereby on the basis of that investigation and Buyer's own judgment. Buyer has not received from nor relied upon Seller for any legal, tax, or accounting advice in relation to its determination to enter into this Agreement or to acquire any Accounts hereunder. Buyer has not received from nor relied upon Seller or Servicer for any advice concerning (i) the suitability of any Accounts as investments by Buyer or for the business purposes of Buyer, (ii) the collectability of any Accounts or proceeds thereof, or the amounts that Buyer may or will ultimately receive as proceeds thereof, or (iii) the legality, appropriateness, or likely outcome of any process or procedure Buyer may utilize or follow in its collections or other remedial efforts in relation to any Accounts acquired hereunder. Except as otherwise provided in Seller's express representations and warranties set forth in this Agreement, Buyer is not acting in reliance on any information furnished by Seller or Seller's personnel, agents, representatives or independent contractors to Buyer to enter into this Agreement or in relation to its determination to acquire any Accounts hereunder.

Section 5.2. Authorization. Buyer is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions, and bylaws in which it may be subject and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

Section 5.3. Binding Obligations. Assuming due authorization, execution, and delivery by each other party hereto, this Agreement, and all of the obligations of Buyer hereunder are the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

Section 5.4. No Conflicts. The execution and delivery of this Agreement by Buyer and Buyer's performance and compliance with the terms of this Agreement will not:

(a) violate Buyer's charter documents or bylaws,

(b) violate any administrative or judicial decree or order or any material law, rule, or regulation to which it is subject, or

(c) constitute a default (or, an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, agreement or other instrument to which Buyer is a party or which may be applicable to Buyer or any of its assets or result in the creation of a lien on any of its assets.

Section 5.5. Pending Actions. There is no proceeding, action, investigation, or litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Buyer's obligations contemplated herein, or which would be likely to impair materially its ability to perform under the terms of this Agreement.

Section 5.6. Consents and Approvals. No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Buyer with this Agreement or the consummation of any other transaction contemplated hereby.

Section 5.7. Not Securities. The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties, or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities."

Section 5.8. Nondisclosure. Buyer is in full compliance with its obligations under the terms of any confidentiality agreement executed by Buyer to review the information made available by Seller or its personnel, agents, representatives, or independent contractors .

Section 5.9. Enforcement/Legal Actions. Buyer will not take any enforcement action against any Obligor which would be a violation of applicable state and/or federal laws and Buyer shall not misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Obligor the identity of Buyer as the owner of the Accounts.

Section 5.10. Status of Buyer. Buyer is (i) a financial institution and (ii) an institutional purchaser including a sophisticated purchaser that is in the business of buying or originating or collecting Accounts of the type being purchased or that otherwise deals in such Accounts in the ordinary course of Buyer's business.

Section 5.11. Licenses. Buyer presently holds and will continue to maintain all licenses, permits, certificates, qualifications, and other approvals that are required by any applicable law or regulation as a result of Buyer's acquisition, ownership, or collection of the Accounts or by virtue of any other obligation of the Buyer under this Agreement, including, but not limited to, any state collections or sales finance license or permit. Promptly after any request by Seller, Buyer shall provide Seller a copy of each such license, permit, certificate, or qualification in a form satisfactory to Seller.

Section 5.12 Time Barred Debt. Buyer will not litigate or threaten to litigate on any Account in which the underlying claim or claims is deemed to be time barred.

Section 5.13. No Principal/Agent Relationship. Buyer understands that there is no principal/agent relationship between Buyer and Seller and that all actions taken by Buyer are solely on its own behalf.

Section 5.14. No Resale of Accounts. Buyer may not resell any Account sold hereunder, other than to one or more of its directly or indirectly wholly owned entities or successor in interest in accordance with Section 9.1.

Section 5.15. Information Security. Buyer presently maintains, and will continue to maintain, appropriate information security programs and measures designed to ensure the security and confidentiality of the confidential information, including, but not limited to, information pertaining to Obligors. Such information security programs and measures include appropriate procedures designed to (i) protect the security and confidentiality of such information; (ii) protect against anticipated threats or hazards to the security or integrity of such information; and (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any Obligor.

Section 5.16. Notice Letter. Buyer will notify each Obligor of the sale of the related Account and notify each Obligor with the name and contact information of Buyer and that such "welcome letter" or communication will comply with all applicable law. This communication shall go out to each Obligor within fifteen (15) days of the applicable Closing Date.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Section 6.1. Seller hereby represents, warrants, and agrees that as of date of this Agreement and as of each Closing Date:

(a) Seller is a limited liability company duly organized under the laws of the State of Delaware.

(b) Seller is duly and legally authorized to execute, deliver, and perform this Agreement, and such execution, delivery, and performance complies with all laws, rules, regulations, charter provisions, and bylaws to which it may be subject. If requested by Buyer, Seller shall, on or prior to the date of this Agreement, supply Buyer with a certificate of the Secretary or Assistant Secretary of Seller regarding the authority of the signer of this Agreement.

(c) Assuming the due authorization, execution, and delivery of this Agreement by each party hereto, this Agreement and all of the obligations of Seller hereunder are the legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, or other similar laws affecting the enforcement of creditors' rights generally, and by general principals of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(d) Seller is not insolvent, and shall not as the result of the transaction contemplated herein become insolvent. Seller is not party to, and shall not as a result of the transaction contemplated hereby have instituted against it, a bankruptcy proceeding seeking relief under any bankruptcy law; is not party to, and shall not as a result of the transaction contemplated hereby have made against it, a general assignment for the benefit of creditors; and shall not have resolved to proceed with any of the foregoing.

(e) Immediately prior to the related Closing Date, Seller will have title to the Accounts, will be the lawful holder of the Accounts and Account Documents and will be duly and legally authorized to sell, transfer, convey, and assign its rights therein. The Accounts are being sold free and clear of all liens, claims, and encumbrances, and Seller will provide to Buyer, on or before each Closing Date (or at such later date that Buyer may request), such lien releases, including but not limited to UCC termination, release, or modification statements, and individual Account lien releases as may be reasonably requested by Buyer to evidence such, in a form acceptable to Buyer.

(f) Seller has had no dealings with any broker, sale advisor, or agent in connection with this Agreement, or if Seller has, any commission or fee associated with the sale of the Accounts to Buyer shall be Seller's responsibility.

(g) The Accounts have been originated, serviced, and collected in accordance with all applicable laws, and are valid, binding, and enforceable obligations, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, or other similar laws affecting the enforcement of creditors' rights generally, and by general principals of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(h) The information set forth on each Account Schedule and the associated Computer File is true and accurate in all material respects.

(i) No Account has been settled or satisfied and none of the Obligors have been released of their liability (including but not limited to the issuance by Seller or any Issuer or Prior Owner of a Form 1099C);

(j) The Accounts are not assigned to any collection agency or third party attorney and, to the best of Seller's knowledge, are not subject to any third party claim, lien, or contingency arrangement.

(k) There is no pending or, to the knowledge of Seller, threatened litigation against Seller from any of the Obligors associated with any of the Accounts.

(l) Seller has no obligation to make future advances on any Account and there are no rights of offset against the Accounts by any Obligor(s).

(m) Prior to the related Closing Date, Seller obtained proper consent from all Issuers and/or Prior Owners requiring consent to resale to sell and assign the Accounts to Buyer. Seller has the right to obtain from all Issuers and Prior Owners any Account Documents not in its possession.

(n) The Accounts were not selected for allocation or sale to Buyer using selection procedures intended or designed to exclude highly-scored accounts from among similar types of accounts.

## ARTICLE VII
## SELLER'S CONDITIONAL OBLIGATION TO REPURCHASE ACCOUNTS

Section 7.1. Seller's Obligation to Repurchase. Notwithstanding Seller's representations and warranties provided in Article VI and the indemnification provided in Article VIII, upon notice from Buyer and for a period of time up to 150 days from the applicable Closing Date, Seller will, at Buyer's option, repurchase (as defined below) any Account as to which any of the following conditions applied on or before the applicable Cutoff Date:

(a) The death of any Obligor on an Account or both parties where a buyer and co-buyer executed the retail installment contract;

(b) An active bankruptcy filing by any Obligor on an Account;

(c) The Account is a duplicate record of any other account in the Computer File;

(d) The Account has been settled or satisfied, or any Obligor has been released of their liability (including but not limited to the issuance of a Form 1099C); or

(e) Any Obligor has made a claim against Seller in any judicial or arbitral forum.

In the event that Buyer elects to have Seller repurchase any such Accounts, the repurchase price shall be the Allocated Account Price. The repurchase price shall be paid to Buyer within ten (10) Business Days after Seller's receipt of notification from Buyer if approved by Seller.

Notwithstanding anything contained herein to the contrary, in no event shall the repurchase of Accounts by Seller exceed ten (10) percent of the total Accounts sold to Buyer under this Agreement. In the event that Seller repurchases any Account from Buyer, Buyer shall have no further remedies against Seller under this Agreement (including, but not limited to, no right to indemnification under Article VIII) or otherwise for any breach of any representation, warranty, or covenant concerning the repurchased Accounts or for any other act or omission of Seller concerning such repurchased Accounts.

## ARTICLE VIII
## MUTUAL INDEMNIFICATION

Section 8.1 From and after the date of this Agreement, Buyer shall indemnify and hold harmless Seller (for the purposes of this Section 8.1, Seller shall include affiliates, shareholders, officers, partners, members, managers, employees, and agents of Seller) from and against any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character, or nature (including reasonable attorneys' fees), which Seller shall incur or suffer as a result of: (i) any act or omission of Buyer or Buyer's agents in connection with the Accounts and its purchase of Accounts pursuant to the Agreement; (ii) the inaccuracy of any of Buyer's representations or warranties herein; (iii) the breach of any of Buyer's covenants herein including its obligations under Article IV Servicing/Collection; (iv) any claim by any Obligor regarding assignment, subsequent enforcement, servicing, or administration of the Accounts by Buyer; (v) any use or misuse of Seller's, Issuer's, or Prior Owner's name in connection with the Accounts; or (vi) any other act or omission of Buyer relating to the Accounts and the Obligors.

Section 8.2 From and after the date of this Agreement, Seller shall indemnify and hold harmless Buyer (for the purposes of this Section 8.2, Buyer shall include affiliates, shareholders, officers, partners, members, managers, employees, and agents of Buyer) from and against any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character, or nature (including reasonable attorneys' fees), which Buyer shall incur or suffer as a result of: (i) the inaccuracy of any of Seller's representations of warranties herein; (ii) the breach of any of Seller's covenants herein; (iii) any act or omission of Seller or Seller's agents in connection with the sale of Accounts pursuant to the Agreement; (iv) any claim by any Obligor regarding Account servicing or enforcement

prior to assignment of Accounts to Buyer; and (v) any other act or omission of Seller relating to the Accounts and the Obligors.

8.3 The party seeking indemnification must give written notice by certified mail of any third party claim within thirty (30) days of receipt of notice of such claim. However, the failure to so notify the indemnifying party within such thirty (30) day period shall not constitute a waiver of such claim for indemnification, but an indemnified party shall not be entitled to receive any indemnification with respect to any loss as a result of the failure of such person to give such notice.

## ARTICLE IX
## BUYER'S RIGHT OF RESALE

Section 9.1 Approval. Buyer may assign any Accounts and its rights under this Agreement to a wholly owned entity of Buyer with written notice to Seller. Buyer may assign any Accounts and its rights under this Agreement to a successor in interest with prior written consent from Seller, which consent will not be unreasonably withheld. Any notices shall be sent pursuant to Article XI.

Section 9.2 Collateral Assignment by Buyer. Notwithstanding anything to the contrary in this Agreement or any other agreement between Seller and Buyer, Buyer may collaterally assign, and grant a security interest in, the Accounts and this Agreement and all of Buyer's right, title, and interest hereunder, to any lender (the "**Lender**"), from whom Buyer shall obtain financing, whether now or in the future. Seller consents to such collateral assignment and security interest and agrees to recognize all rights of Lender as collateral assignee and secured party. Without limiting the foregoing, Seller acknowledges and agrees that (a) Lender, as collateral assignee and secured party, shall be entitled to enforce all rights and interests of Buyer under this Agreement, including without limitation as provided by Article VIII (in each case subject to and in accordance with the terms thereof) and (b) notwithstanding anything in this Agreement to the contrary, Lender shall be entitled to exercise all rights and remedies of a secured party in respect of the Accounts as provided by the applicable Uniform Commercial Code. Nothing herein shall constitute an assumption by the Lender, and the Lender shall have no liability for, any of Buyer's obligations under the Agreement other than, to the extent it undertakes to service the Accounts, to service the Accounts in accordance with applicable law. Buyer shall remain bound by its obligations under this Agreement and nothing contained in this Section 9.2, nor any actions taken by the Lender, shall relieve Buyer of any of its obligations under this Agreement.

Section 9.3 Liability. No sale or transfer of any Account by Buyer to a third party will relieve Buyer or Seller of any of their obligations or liabilities under this Agreement.

## ARTICLE X
## CONFORMITY TO LAW

Section 10.1 Conformity to Law. Buyer agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules, and regulations regarding the handling, servicing, collection, and maintenance of all Accounts and all documents and records relating to the Accounts purchased hereunder including, but not limited to, the length of time such documents and records are to be retained and making any disclosures to Obligors as may be required by law.

## ARTICLE XI
## NOTICE

Unless otherwise provided for herein, notices and other communications required or permitted hereunder shall be in writing to the parties and addresses below and shall be delivered by certified mail return receipt requested or express mail. Such notice shall be deemed to have been received on the date delivered.

| | |
|---|---|
| If to Buyer: | NCB Management Services, Inc.<br>One Allied Drive<br>Trevose, PA 10953<br>Attention: Ralph Liberio, President & CEO |
| With a copy to: | NCB Management Services, Inc.<br>One Allied Drive<br>Trevose, PA 10953<br>Attention: Abigail Pressler, General Counsel |
| If to Seller: | Exeter Finance LLC<br>2101 West John Carpenter Freeway<br>Irving, TX 75063<br>Attention: Mark Mooney, Vice President<br>Telephone: 469-754-4189 |
| With a copy to: | Exeter Finance LLC<br>2101 West John Carpenter Freeway<br>Irving, TX 75063<br>Attention: General Counsel |

## ARTICLE XII TERM AND TERMINATION

Section 12.1 Term. This Agreement shall be effective as of the Effective Date and shall continue through the Termination Date as defined above.

Section 12.2 Termination for Cause.

(a) Seller may terminate this Agreement upon fifteen (15) days' written notice to Buyer if (i) Buyer fails or refuses to purchase any Accounts on a Closing Date; (ii) Buyer becomes insolvent, has instituted a bankruptcy proceeding seeking relief under any bankruptcy law, has an involuntary petition for bankruptcy filed against it and fails to have such petition dismissed within thirty (30) days of the filing date, or makes a general assignment for the benefit of creditors; (iii) Buyer is dissolved or passes a resolution for its winding up, other than pursuant to a merger, consolidation, or transfer of substantially all of its assets; or (iv) Buyer breaches any other representation, warranty, term, or condition herein and fails to cure such breach in all material respects within fifteen (15) days after receipt of Seller's notice of such breach.

(b) Buyer may terminate this Agreement upon fifteen (15) days' written notice to Seller if (i) Seller fails or refuses to sell Accounts as required by this Agreement; (ii) Seller becomes insolvent, has instituted a bankruptcy proceeding seeking relief under any bankruptcy law, has an involuntary petition for bankruptcy filed against it and fails to have such petition dismissed within thirty (30) days of the filing date, or makes a general assignment for the benefit of creditors; (iii) Seller is dissolved or passes a resolution for its winding up, other than pursuant to a merger, consolidation, or transfer of substantially all of its assets; or (iv) Seller breaches any other representation, warranty, term, or condition herein and fails to cure such breach in all material respects with fifteen (15) days after receipt of Buyer's notice of such breach.

Section 12.3 Termination for Convenience. Either party may terminate this Agreement without cause by providing sixty (60) days' written notice to the other party.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

Section 13.1 Severability. If any term, covenant, condition, or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

Section 13.2 Rights Cumulative: Waivers. The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth herein. The rights of each of the parties hereunder shall not be capable of being waived or varied other than by an express waiver or variation in writing by each party hereto. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

Section 13.3 Headings. The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of the Agreement or any provision hereof.

Section 13.4 Construction. Unless the context otherwise requires, singular nouns and pronouns when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

Section 13.5 No Presumptions. The parties have jointly participated in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any provisions of this Agreement.

Section 13.6 Assignment. This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights, and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns. Neither party may assign this Agreement or any of its rights in this Agreement without the other party's prior written consent, except that Buyer or Seller may freely assign this Agreement without consent to an affiliate, or as permitted by Article IX.

Section 13.7 Prior Understandings. This Agreement supersedes any and all prior discussions and agreements between Seller and Buyer with respect to the purchase of the Accounts and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

Section 13.8 Integrated Agreement. This Agreement and all Exhibits and Schedules hereto constitute the final complete expression of the intent and understanding of Buyer and Seller. This Agreement shall not be altered or modified except by a subsequent writing signed by Buyer and Seller.

Section 13.9 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and either party hereto may execute this Agreement by signing any such counterpart. The counterparts of this Agreement may be executed and delivered by facsimile, email, or other electronic signature (including portable document format) by either of the parties and the receiving party may rely on the receipt of such document so executed and delivered electronically or by facsimile or email as if the original had been received.

Section 13.10 Non-Merger/Survival; Survival Period. Each and every covenant hereinabove made by Buyer or Seller shall survive the delivery of the Transfer Documents and shall not merge into the Transfer Documents, but instead shall be independently

enforceable. Notwithstanding anything to the contrary set forth herein, Seller's indemnification obligations under Article VIII and all indemnifications and covenants of Seller contained in this Agreement shall terminate and cease to be of further force and effect as of the third anniversary of the related Closing Date. Seller's representations and warranties as of the date of this Agreement pursuant to Article VI shall not expire or terminate.

Section 13.11 Governing Law/Choice of Forum. This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the law of the State of Texas. The parties agree that any legal actions between Buyer and Seller regarding the purchase of the Accounts hereunder shall be originated in a court of competent jurisdiction in the State of Texas, and both parties hereby consent to the jurisdiction of such court. In the event of litigation under this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs.

Section 13.12 No Third-Party Beneficiaries. This Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

Section 13.13 Expenses. Except as otherwise expressly provided in this Agreement, Buyer and Seller will each bear its own out-of-pocket expenses, including fees and disbursements of its attorneys, brokers, consultants, and any other agents or representatives, in connection with the transaction contemplated by this Agreement. Seller shall be responsible for all costs and expenses relating to the Accounts that are incurred by Seller prior to or after each Closing Date.

Section 13.14 Limited Power of Attorney. Seller hereby grants, and shall execute and deliver, to Buyer a limited Power of Attorney in the form of Exhibit F on each Closing Date.

Section 13.15 UCC Filing. Seller hereby consents to the filing of a UCC-1 financing statement, substantially in the form of Exhibit G, which may be filed at the option of Buyer.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

| | |
|---|---|
| BUYER: NCB Management Services, Inc. | SELLER: Exeter Finance LLC |
| [signature] | |
| Name: Ralph Liberio | Name: Brad Martin |
| Title: President & CEO | Title: President & Chief Operating Officer |

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

BUYER: NCB Management Services, Inc.

By: ___________________________

Name: Ralph Liberio

Title: President & CEO

SELLER: Exeter Finance LLC

By: ___________________________

Name: Brad Martin

Title: President & Chief Operating Officer

# EXHIBIT A
## ACCOUNT SCHEDULE

This Account Schedule shall be provided by Seller to Buyer on each Closing Date.

1. **Closing Date:** [Closing Date]

2. **Cutoff Date:** [Cutoff Date]

3. **Computer File:** Excel spreadsheet named "[File Name]"

4. **Total Number of Accounts:** _________

5. **Total Face Value (Aggregate Current Balance):** $_______________

6. **Purchase Price Percentage:** [redacted]

7. **Purchase Price:** $_____________

## EXHIBIT B

## BILL OF SALE AND ASSIGNMENT OF ACCOUNTS

Exeter Finance LLC ("Seller" or "Assignor"), hereby absolutely sells, transfers, assigns, sets over, and conveys to NCB Management Services, Inc. ("Buyer" or "Assignee"), without recourse and without representations or warranties except those as outlined in the Agreement (as defined below), express or implied, of any type, kind, or nature:

(a) all of Assignor's right, title, and interest in and to each of the Accounts sold on [Closing Date] ("**Closing Date**") as identified in the Account Schedule and more specifically defined in that Computer File titled "[File Name]" (the "Accounts") together with the Account Documents; and

(b) all principal, interest, or other proceeds of any kind with respect to the Accounts, but excluding any payments or other consideration received by or on behalf of Assignor prior to the Cutoff Date (as defined in the Agreement) with respect to the Accounts.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase and Sale Agreement made and entered into by and between Seller and Buyer effective as of January 1, 2022(the "Agreement"). The Accounts are defined and described in the Agreement and are being conveyed hereby subject to the terms, conditions, and provisions set forth in the Agreement.

This Bill of Sale shall be governed by the laws of the State of Texas without regard to the conflicts-of-laws rules thereof.

DATED:

SELLER:

By:__________________________________

Name: Brad Martin

Title: President & COO

## EXHIBIT C-1
## AFFIDAVIT OF DEBT

STATE OF
COUNTY OF

The undersigned, ___________________________ being duly sworn, states and deposes as follows:

1. I am an employee of _______________ located at _______________, and am authorized to make the statements and representations herein. My job responsibilities include maintaining and recording information in ____'s records as they relate to accounts owned by ________. The statements set forth in this affidavit are true and correct to the best of my knowledge, information and belief based on either personal knowledge or review of the business records of ___________.

2. My duties include having knowledge of, and access to, business records relating to the ___________ account referenced above. These records are kept by __________ in the regular course of business and it was in the regular course of business of ________ for an employee or representative with personal knowledge of the act, event, condition, or opinion recorded to make memorandum or records or to transmit information thereof to be included in such memorandum or records; and that the records were made at or near the time of the act and/or event recorded or reasonably soon thereafter.

3. That __________, in the regular course of business, provides various account processing services, including causing to be sent to customers periodic billing statements reflecting true and accurate activities on the customers' respective account(s) (other than months in which no statement may have been required by law).

4. That the records of _______ indicate that account ending XXXX-XXXX-XXXX-____ was opened on, or acquired by ______ on,________(Account). The account holder's name at time of electronic transmission was ___________, with a Social Security Number, Employer Identification Number, and/or Taxpayer Identification Number ending: xxx-xx-____.

5. That the records of _______ indicate that as of the date the Account was sold, there was due and payable on the Account $_____. There were no uncredited payments owed to the Account.

6. That the records of _______ indicate that the last payment received on the Account by __________ posted to the account on ___________.

7. That the records of _________ indicate that the Account was sold to _____________ on or about ________ and __________ retained no ownership interest in the account after it was sold.

FURTHER AFFIANT SAYETH NOT.

Dated this ____ day of ____________, 20__ by ____________________________________.

Subscribed and sworn to before me this ___ day of _________, 20___ by ________________________, an employee of __________________________.

___________________________________ My Commission Expires: _______________

*Notary Public*
(Notary Stamp/Seal)

**EXHIBIT C-2**
**AFFIDAVIT OF SALE**
**BY CREDITOR**

State of Texas, County of ____________.

____________________ being duly sworn, deposes and says:

I am over 18 and not a party to this action. I am the ___________________________(title) of ________________________ (creditor). In that position I am a custodian of the creditor's books and records, and am aware of the process of the sale and assignment of electronically stored business records.

On or about ___________(date)____________________(creditor) sold a pool of charged-off accounts (the Accounts) by a Purchase and Sale Agreement and a Bill of Sale to _________________(Buyer.)
As part of the sale of the Accounts, electronic records and other records were transferred on individual Accounts to the Buyer. These records were kept in the ordinary course of business of _____________________(creditor).

I am not aware of any errors in these accounts. The above statements are true to the best of my knowledge.

Signed this ____________day of _____________,__________.

___________________________
(Name of Affiant)

Sworn before me this ________day of ______________,____________.

_________________________
(Notary Stamp)

## EXHIBIT C-3

## AFFIDAVIT OF FACTS AND SALE OF ACCOUNT BY CREDITOR (DEBT BUYER ACTIONS)

The undersigned, being duly sworn, deposes and says:

1. I am a/an __________ [employee/officer/member] of _________[ creditor] ("Creditor"), and I have personal knowledge of and access to Creditor's books and records ("Business Records"), including electronic records, relating to a pool of charged-off consumer credit accounts sold or assigned by ____________ [creditor] to ______________ [buyer] ("Buyer"), on __________ [date] (the "Sale"), which included the account ("Account") of the consumer ("Consumer") identified in the exhibits attached hereto and incorporated herein. As part of the Sale, Creditor assigned all of its interest in the Account, including the right to any proceeds from the Accounts, to Buyer, and it transferred Business Records relating to the Account to Buyer. A true and correct copy of the bill of sale or written assignment of the Account is attached as an exhibit to this affidavit.

2. In my position, I also have personal knowledge of Creditor's procedures for creating and maintaining its Business Records, including its procedures relating to the sale and assignment of consumer credit accounts. Creditor's Business Records were made in the regular course of business and it was the regular course of such business to make the Business Records. The Business Records were made at or near the time of the events recorded. Based on my knowledge of Creditor's Business Records, I have personal knowledge of the facts set forth in this affidavit.

3. Creditor and Consumer were parties to a retail installment agreement ("Agreement"). Consumer agreed to pay Creditor for all credit advances provided pursuant to the Agreement. The date and the amount of the last payment, if any, made by Consumer are set forth in an exhibit attached hereto and made a part hereof. Consumer defaulted and a demand for payment was made by Creditor. A true and correct copy of the Agreement is attached as an exhibit to this affidavit.

4. I have personal knowledge of Creditor's procedures for generating and mailing account statements to customers. It is the regular practice of Creditor's business to provide periodic account statements to its customers. Creditor sent one or more account statements relating to the Consumer's Account to Consumer on the date(s) and for the amount(s) due set forth in an exhibit attached hereto and made a part hereof. The account statement(s) were mailed to Consumer's last known address and Creditor's Business Records do not reflect that the statement(s) were returned by the post office or that the Consumer objected to them. A true and correct copy of the most recent account statement(s) generated and mailed by Creditor is attached as an exhibit to this affidavit.

5. At the time of Sale, Consumer owed the amount set forth in the exhibits attached hereto and made a part hereof, which also set forth the name of the Consumer; the last four digits of the Account number; the date and amount of the charge-off balance; the date and amount of the last payment, if any; the total amounts, if applicable, of any post-charge-off interest and post-charge off fees and charges; any post-charge-off credits or payments made by or

on behalf of the Consumer; and the balance due at the time of the Sale. The above statements are true and correct to the best of my personal knowledge.

Dated: ___________________

________________________
[Name]

Sworn to before me this ___ day of _________, 20____.

____________________
Notary Public

**EXHIBIT C-4**
**DECLARATION**

1. I am an employee of ______________________ located at _________________, and am authorized to make the statements and representations herein. My job responsibilities include maintaining and recording information in _______________'s records as they relate to accounts owned by __________. The statements set forth in this affidavit are true and correct to the best of my knowledge, information and belief based on either personal knowledge or review of the business records of _______________.

2. My duties include having knowledge of, and access to, business records relating to the ___________ account referenced above. These records are kept by ____________ in the regular course of business and it was in the regular course of business of ___________ for an employee or representative with personal knowledge of the act, event, condition, or opinion recorded to make memorandum or records or to transmit information thereof to be included in such memorandum or records; and that the records were made at or near the time of the act and/or event recorded or reasonably soon thereafter.

3. That _____________, in the regular course of business, provides various account processing services, including causing to be sent to customers periodic billing statements reflecting true and accurate activities on the customers' respective account(s) (other than months in which no statement may have been required by law). That the ____________ periodic billing statements attached hereto are true and correct _______ business records for account ending XXXX-XXXX-XXXX-____.

4. That the records of __________ indicate that account ending XXXX-XXXX-XXXX-____ was opened on, or acquired by ___________ on,________(Account). The account holder's name at time of electronic transmission was ___________, with a Social Security Number, Employer Identification Number, and/or Taxpayer Identification Number ending: xxx-xx-____.

5. That the records of _________ indicate that as of the date the Account was sold, there was due and payable on the Account $_____. To the best of my knowledge, information and belief there were no uncredited payments owed to the Account.

6. That the records of ___________ indicate that the last payment received on the Account by ______ posted to the account on ___________.

7. That the records of ___________ indicate that the charge off balance was $___________, and that there was an additional post charge off late fee of $_____.

8. That the records of ____________ indicate that the Account was sold to _____________ on or about ________ and __________ retained no ownership interest in the account after it was sold.

9. That the records of ________ indicate that the last known address of the account holder prior to the sale of the Account was ___________.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

Executed this ____ day of _____________, 20__, at __________________.

Signature: _________________________

By: _________________________

Title: _______________________

# EXHIBIT D
## WIRE INSTRUCTIONS

Bank Name: [redacted]

ABA Number: [redacted]

Credit to Account: [redacted]

Account Number: [redacted]

Reference: [Closing Date] Deficiency Sale

In order to assure proper allocation of funds to Buyer's balance due, this information must be included on all wire transfers.

## EXHIBIT E
## LITIGATION AGAINST OBLIGORS

| ACCOUNT # | OBLIGOR | CURRENT BALANCE | ATTORNEY NAME/PHONE# |
|---|---|---|---|

N/A

# EXHIBIT F
## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that with respect to those certain Accounts that Exeter Finance LLC ("Seller") sold to NCB Management Services, Inc. ("Buyer") on [CLOSING DATE] pursuant to the Purchase and Sale Agreement between Seller and Buyer effective as of January 1, 2022 (the "Agreement"), Seller hereby names, constitutes, and appoints Buyer or any of its authorized agents, employees, or representatives, its duly authorized attorney and agent with limited power and authority to i) endorse checks and other negotiable instruments which may be received by Buyer; ii) perfect, maintain, and release any security interests in the Accounts; iii) transfer and obtain any titles, evidence of ownership, or Account Documents; iv) settle any insurance claims or litigation and apply for any insurance, warranty, or sales tax refunds; v) terminate or modify any third party agreements; and vi) to perform any and all acts relating to the Accounts which the undersigned was entitled to do as the owner of said purchased Accounts. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Agreement.

EXECUTED this __________ day of ____________ 20__,

SELLER: Exeter Finance LLC

By: ____________________________________
Name: Brad Martin
Title: President & CEO

STATE OF __________________________)
) ss.
COUNTY OF ________________________)

This instrument was acknowledged before me on the _____ day of _______, 20__ by ______________________ as President on behalf of __________________________.

_______________________________________
Notary Public in and for the State of ____________

# EXHIBIT G

[redacted]

**FINANCING STATEMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| |
|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| B. SEND ACKNOWLEDGEMENT TO: (Name and Address) |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only <u>one</u> debtor name (1a or 1b) – do not abbreviate or combine names

| | | | | | | |
|---|---|---|---|---|---|---|
| OR | 1a. ORANIZATION'S NAME (SELLER) | | | | | |
| | 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | | | CITY | STAT E | POSTAL CODE | COUNTR Y |
| 1d. TAX I.D. # SSN OR EIN | ADD'NL INFO RE ORGANIZAT ION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL I.D. #, if any ☐NONE | | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only <u>one</u> debtor name (2a or 2b) – do not abbreviate or combine names

| | | | | | | |
|---|---|---|---|---|---|---|
| OR | 2a. ORGANIZATION'S NAME | | | | | |
| | 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | | | CITY | STAT E | POSTAL CODE | COUNTR Y |
| 2d. TAX I.D. # SNN OR EIN | ADD'NL INFO RE ORGANIZAT ION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL I.D. #, if any ☐NONE | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE OF ASSIGNOR S/P) - insert only <u>one</u> secured party name (3a or 3b)

| |
|---|
| 3a. ORGANIZATION'S NAME (BUYER) |

| | | | | | | |
|---|---|---|---|---|---|---|
| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | | COUNTRY<br>USA |

This FINANCING STATEMENT covers the following types or collateral:

All of the Debtor/Seller's right, title and interest in and to all Accounts purchased by Secured Party/Buyer pursuant to the terms of that certain Purchase and Sale Agreement executed by Debtor/Seller and Secured Party/Buyer and dated as of [ ] [ ], 20__ (the "Purchase Agreement"), specifically those Accounts, related indebtedness, all monies due thereon or paid thereunder or in respect thereof, liens, security interest, or other security instruments or encumbrances executed, filed and/or created in conjunction with said Accounts and all other rights ancillary to said Accounts including, without limitation, all proceeds for any of the foregoing and all other amounts payable in respect of the foregoing, as specified in the Purchase Agreement referenced above. Such Accounts are referred to in said Purchase Agreement and described in Exhibit A attached thereto. This filing reflects a true sale of the Accounts from Debtor/Seller to Secured Party/Buyer.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSOR/LESSEE ☐ CONSIGNOR/CONSIGNEE ☐ BAILEE/BAILOR ☒ BUYER/SELLER ☐ AG. LIEN ☐ NON-UCC FILING

| | |
|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
| **8. OPTIONAL FILER REFERENCE DATA** | |

**FILING OFFICE COPY - NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)**

**EXHIBIT H**
**ACCOUNT CRITERIA**

| |
|---|
| **INCLUSIONS** |
| D Status Only |
| 12 months and Greater from Charge Off |
| |
| **EXCLUSIONS** |
| Exclude accounts that are closed. |
| Exclude accounts that have a borrower resident or co borrower resident state in MS. |
| Exclude accounts that have a contract or borrower resident or co borrower resident state in CA, OH or WI if there was ever a repo. |
| Exclude accounts with any payment or portion of a payment in the last 60 days |
| Exclude accounts with LIQU payment description in the last 6 months |
| Exclude accounts with LIQU payment description and no DEFM activity note |
| Exclude accounts without a LIQU or ITOL payment description or with a LIQU or ITOL that reversed and was not reapplied |
| Exclude accounts with a DEFM activity note in the last 30 days |
| Exclude any account ever in a legal que: Any account where activity code or APF RLGL was ever ran or account is or has been in List 1761, 1796 or 1960 |
| Exclude all known Bankruptcy or potential Bankruptcy (C/O Lists 1770, 1795, 1870, 1875, 1885, 1890, 1898 and/or B status) or if BK dismissed less than 30 days prior |
| Exclude accounts where any Obligor's are deceased. This is any account in list 1810, 1811 and/or with Activity any of the following activity codes C999, CDEC, DCCR, EOED. |
| Exclude accounts with known fraud / forgery which includes any accounts in lists 1932 (Suspected Fraud) and/or 1772 (Fraud Queue/ Synthetic Social) |
| Exclude all accounts in List 1730 or 1735, and or where SCRA protected = Y or UR and/or if SCRA activity code has ever been placed on the account and/or if RVER Activity code is on the account without a SCRD at a following date |
| Exclude any account that is a Written or Both C&D - This is any account in List 1739 or 1740 with a C&D Type = Written or Both |
| Exclude any account where the principal balance in the system of record is below $500 |
| Exclude any account previously Sold In a Debt Sale (Branch Report: 7100, 7200, 7120, 7121, 7110, 7150, 7201, 7151, 7101, 7122, 7123, 7126, 7127, 7128, 7155, 7156, 7159, 7160, 7161, and/or Facility Number 4107, 4109, 4112, 4116, 4118 and/or Trans Descriptions: DSWD, DECN, BKSL, DFSL and/or list 1786) |
| Exclude non owned (Securitized OK / EART OK - Verify manually with treasury/financial analytics to confirm for non owned) |
| Exclude any Employee Accounts (List 1800) (Employer = Exeter) |
| Exclude any account with maintenance currently in process (List – 1924) |
| Exclude any account that is a Small Balance Write off (List – 1926) |
| Exclude any account that is within 6 months of the state determined Statue of Limitations or more than 1,278 days from C/O |

| |
|---|
| Exclude any Account with an open complaint in OOP. List 1799. |
| Exclude any Account with a SPCO APF completed in the last 30 days. |
| Exclude any Account in list 1931- payment dispute. |
| Exclude any account less than 60 days past due. |
| Exclude accounts that have a contract or borrower resident or co borrower resident state in CT and a LIQU payment description that has not been reversed. |
| Exclude any account with an open CBR claim: Any account with a CBRI activity code without a following CBDD. |
| Exclude any account with an IDTX activity code. |
| Exclude any account that has a contract, borrower resident or mailing, coborrower resident or mailing or title state in MA. |
| Exclude any Account that has ever had a complaint: Any account with a COMO activity code. |
| Exclude any Account that has a 'channel' in the APP Ln Funding table of 'ORL' or 'Open Road Loan'. |

**Term Definitions:**

| Phrase, Word or Term being defined | Description/Definition |
|---|---|
| D Status | This is an indicator in Exeter's system of record that the account is charged off. |
| LIQU | This is the payment description assigned in Exeter's system of record to auction proceeds after a unit is sold at auction. |
| DEFM activity note | This is a note identifier in Exeter's system of record indicating when the deficiency letter was mailed on an account after the unit was sold at auction due to repo. |
| ITOL | This is the payment description assigned in Exeter's system of record to a total loss payment received from an insurance company after a unit is deemed a total loss. |
| APF RLGL | This is an account process function that moves an account to a queue to be reviewed for any legal concerns and a note identifier when that is done. |
| C999 | This is a note identifier in Exeter's system of record indicating a completion of any deceased maintenance on an account. |
| CDEC | This is an account process function that identifies a confirmation of death and starts remaining processes. |
| DCCR | This is a note identifier in Exeter's system of record indicating a copy of the death certificate was received. |
| EOED | This is a note identifier in Exeter's system of record indicating a copy of executor of estate documents were received. |
| SCRA protected = Y | This identifies an account is protected under the Servicemembers Civil Relief Act. |

| | |
|---|---|
| SCRA protected = UR | This indicates an account is Under Review for potential protection from the Servicemembers Civil Relief Act. |
| RVER | This is an account process function that moves an account to be reviewed for SCRA coverage. |
| SCRD | This is an account process function that moves an account back out of the SCRA queue if customer is not eligible for coverage & SCRA has been denied. |
| C&D | This is an abbreviation identifier for cease and desist |
| EART | This is an internal identifier for securitization indicating the account is now fully Exeter owned. |
| OOP | This is a note identifier in Exeter's system of record indicating Exeter received a regulatory or BBB issues, concerns or complaint and the account has been moved to be worked by our escalated complaint team. |
| SPCO | This is a note identifier in Exeter's system of record indicating there is a settlement pending for a charged off account |
| CBRI | This is a note identifier in Exeter's system of record indicating Exeter received a Credit Bureau Reporting Inquiry - A request to review the reporting for accuracy due to a customer concern. |
| IDTX | This is a note identifier in Exeter's system of record indicating the account has been reviewed and confirmed as originated or impacted by ID Theft. |
| COMO | This is an indicator in Exeter's system of record that there has been a complaint opened at some point on this account. |
| ORL / Open Road Loans | This is a new Exeter originations channel for which Exeter has not determined all processes and licensing required to include as part of the debt sales at this time. |

## EXHIBIT B
## BILL OF SALE AND ASSIGNMENT OF ACCOUNTS

Exeter Finance LLC ("Seller" or "Assignor"), hereby absolutely sells, transfers, assigns, sets over, and conveys to NCB Management Services, Inc. ("Buyer" or "Assignee"), without recourse and without representations or warranties except those as outlined in the Agreement (as defined below), express or implied, of any type, kind, or nature:

(a) all of Assignor's right, title, and interest in and to each of the Accounts sold on March 23, 2023 ("Closing Date") as identified in the Account Schedule and more specifically defined in that Computer File titled "**Exeter-NCB_Cutoff_Main-03-14-2023.xlsx"** (the "Accounts") together with the Account Documents; and

(b) all principal, interest, or other proceeds of any kind with respect to the Accounts, but excluding any payments or other consideration received by or on behalf of Assignor prior to the Cutoff Date (as defined in the Agreement) with respect to the Accounts.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase and Sale Agreement made and entered into by and between Seller and Buyer effective as of January 1, 2022 (the "Agreement"). The Accounts are defined and described in the Agreement and are being conveyed hereby subject to the terms, conditions, and provisions set forth in the Agreement.

This Bill of Sale shall be governed by the laws of the State of Texas without regard to the conflicts-of-laws rules thereof.

DATED: March 21, 2023

SELLER:

By: [signature]

Name: Brad Martin

Title: President & COO